UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
FEI JING, LUOSO LI, JINYU HE,
DUANYANG WANG, TIAN LAN,
CHUYAO FENG,

                                 Plaintiffs,                       **REPORT AND
RECOMMENDATION**

           -against-                              CV 21-2350 (GRB)(AYS)

YAN SUN,

                                     Defendant.
-------------------------------------------------------------X

**SHIELDS, Magistrate Judge:**

       Plaintiffs commenced this action on April 28, 2021 against Defendant Yan Sun ("Defendant" or "Sun"), pursuant to the Commodity Exchange Act (the "CEA" or the "Act") and regulations promulgated thereunder, as well as state law. (Compl., Docket Entry ("DE") [1].) The CEA causes of action allege claims of fraud pursuant to the Act and regulations promulgated thereunder, and failure to register with the Commodity Futures Trading Commission (the "CFTC" or the "Commission"). See 7 U.S.C. §§ 6b, 6o1(B) and 9 (fraud claims) and 7 U.S.C. §§ 6d, 6m(1)(failure to register claims); 17 C.F.R. §180.1(a); 17 C.F.R. §3.10 (CFTC regulations). Plaintiffs' common law claims allege conversion, breach of contract and unjust enrichment.

       Generally, all claims are based upon the factual allegation that Defendant held himself out as an investment instructor, well-versed in the buying and selling of the cryptocurrency known as Bitcoin ("BTC"). Plaintiffs, who often refer to Defendant as "Dean," allege that they were enrolled in Defendant's online investment academy referred to as the "Real Trade Institute" ("RTI"). Plaintiffs allege that Sun failed to invest funds transferred to him to purchase BTC. Those funds, either in the form of U.S. dollars, Chinese Yuan (also referred to as "RMB") and/or

BTC, were transferred electronically to Sun for the purchase of BTC. Plaintiffs state that they were assured payment of quarterly dividends. Each was also specifically told that their investments were risk-free, in that they were guaranteed the return of principal at any time.

Each Plaintiff sought to exercise their right to withdraw their BTC and the guaranteed return of their investments. When their requests were ignored, they commenced this action. Here, Plaintiffs do not seek only the promised return of their investments in the form and amount of currencies used for their purchases of BTC. Instead, Plaintiffs seek a judgment in U.S. dollars representing the current/judgment day value of the 23 Bitcoins that the Defendant was supposed to have purchased for them. (See generally Compl., DE [1].)

After Defendant neither answered nor moved with respect to the Complaint, Plaintiffs sought, and the Clerk of the Court entered, a notation of default. (DE [8], [9].) Plaintiffs thereafter sought entry of judgment in, as noted above, the judgment day value of 23 BTC. (DE [10].) Relying on the known fluctuation of the value of BTC, Plaintiffs also sought expedited consideration of their request for a judgment of default. Shortly after directing Plaintiffs to complete the District Court's default judgment form, District Judge Brown vacated his order requiring that the form be completed. Instead, in light of the claimed fluctuation of damages, Judge Brown referred the motion to this Court for a Report and Recommendation as to whether the judgment sought should be granted and the appropriate amount of damages, costs and fees, if any, to be awarded. (Orders of Brown, J., dated June 8, 2021.)

After referral of the motion, this Court directed Plaintiffs to file a memorandum of law addressing the standards of law under the CEA and their position with respect to the claimed entitlement to relief thereunder. The Court also directed Plaintiffs to brief their claimed justification to expedited review, with supportive caselaw. (Order of Shields, M.J., dated June

14, 2021.) Plaintiffs promptly complied with this Court's directive. However, upon review of Plaintiffs' submissions (which consisted of nearly impossible to interpret screen shots of Chinese language conversations held via the "WeChat" app and evidence of wire transfers of dollars, RMB, and BTC to Defendant's account), the Court directed that an in-person hearing be held on November 15, 2021. (Order of Shields, M.J., dated Oct. 14, 2021.) Counsel was directed to be prepared to address Plaintiffs' claims on the merits and, in particular, the claim that they were entitled to a dollar judgment reflecting the value of BTC on the date that judgment would be entered. In addition to presenting each Plaintiff's testimony, Plaintiffs were directed to present an expert to explain and support their valuation of BTC.

On November 15, 2021, this Court held the scheduled hearing.[1] Neither the Plaintiffs nor their counsel appeared in Court. Instead, pursuant to their requests, this Court held a hearing where all attended remotely. While Plaintiffs' counsel provided for an interpreter to appear virtually, counsel did not provide for real-time interpreting. Given the fact that most of the six Plaintiffs do not speak English and each had their own set of circumstances to discuss, it became apparent that conducting the hearing without real-time interpreting was not a viable way to proceed. The Court therefore adjourned the hearing. Additionally, since the exhibits submitted in support of Plaintiffs' claims were presented in a nearly incomprehensible fashion, the Court directed Plaintiffs' counsel to re-submit those exhibits in a way that made more sense. The Court trusted that counsel would be able to re-submit the Chinese language WeChat screen shots, upon which the Plaintiffs rely in support of all claims, in a manner to make them understandable. The

---

[1] In light of the facts that: (1) Plaintiffs' request to expedite their hearing was based only on the assertion that they were entitled to preferential treatment because of the risky and fluctuating nature of their investments and, (2) the Court was prepared to move forward and was delayed only by the difficulty in making sense of Plaintiffs' submission, the Court also denied the request for an expedited hearing.

Court deemed clear presentation of this evidence critical to fulfill its obligation to make a comprehensible recommendation to the District Court. Clear presentation of the WeChat conversations supporting Plaintiffs' claims was particularly essential to this Court's task since there are no contracts, and nothing else in writing, between or among any of the Plaintiffs and the Defendant. Instead, the Chinese language WeChat screen shots are the only evidence of any purchase or investment agreement, or alleged fraud.

Plaintiffs submitted additional exhibits to the Court on November 22, 2021. While the newly filed exhibits include translations, the presentation of those exhibits are, to say the very least, less than helpful. Instead of presenting each Plaintiff's affidavit with their own translated WeChat conversations attached, counsel presented each Plaintiff's affidavit separately, with their WeChat screenshots elsewhere on the docket. To make matters worse, the "courtesy" copies of the affidavits are labeled with letters (without tracking or even noting the ECF docketing numbers), while the documents submitted on ECF bear numbers. Additionally, the newly submitted affidavits and documents, which appear under Docket Entry [16], make no clear reference to the earlier submitted documents under Docket Entry [13]. The eighty pages of group chat screenshots are nearly impossible to decipher because Plaintiffs' affidavits do not disclose any screen names or profile pictures they used during the course of conversations. To make sense of Plaintiffs' submission, the Court was required, as detailed below, to piece together the variously submitted affidavits and exhibits as best it could.

In any event, upon review of Plaintiffs' renewed submissions and exhibits, the Court finds that any further hearing, for which Plaintiffs will undoubtedly request virtual appearances, would no longer be helpful. Instead, upon review of the documents submitted and for the reasons set forth below, this Court respectfully recommends that Plaintiffs' motion for default judgment

be granted in part and denied in part, such that it be held that the well-pleaded allegations of the Complaint entitle Plaintiffs to a judgment finding that Defendant violated the broadest anti-fraud provision of the Act by lying to the Plaintiffs about Sun's purchase of BTC, his expertise in the buying and management of BTC investment, and Plaintiffs' rights to withdraw the principal amount of their investments or their Bitcoins at any time. As to damages, the Court recommends that damages be awarded to each of the Plaintiffs in U.S. dollars in the amounts that each invested with Defendant.  All Plaintiffs should also be awarded post-judgment interest.

BACKGROUND

I.      <u>The Parties</u>

      A.      <u>Plaintiffs</u>

Plaintiffs are six individuals who allege that they were induced to transfer funds (in either US currency, BTC or RMB) to Defendant. The discussion below is based upon the Court's review of the confusing documents submitted, but upon which the Court is prepared to make factual recommendations to the District Court.

Before turning to the recommendations, the Court illustrates its frustration with Plaintiffs' submissions, and describes what is necessary to piece together the claim of just one Plaintiff – the first named Plaintiff, Fei Jing ("Jing"). To make sense of this claim, the Court had to refer to four separately submitted documents. First, there is Jing's affidavit, which appears as Docket Entry [13-10]. This is Jing's affidavit in support of the motion for a judgment of default. That affidavit refers to confirmation of his wire transfer to Sun as "attached hereto as Exhibit 1." Exhibit 1, however, is not "attached" to Jing's affidavit, but, instead, appears as Docket Entry [13-3]. The WeChat screenshots upon which all Plaintiffs rely similarly appear as unmoored Exhibits in Docket Entry [16]. For Plaintiff Jing, the affidavit attesting to the translation appears

5

as Docket Entry [16-1]. That affidavit states that "attached hereto" as Exhibit 9 are copies of the translated conversations. Exhibit 9 is not attached to Docket Entry [16-1]. Instead, it appears as Docket Entry [16-9], which, while requiring an unwieldy navigation through the Court's ECF System, makes some sense, since, unlike the exhibits referred to in Docket Entry [13], it bears the same number referred to in the affidavit. The entry under Docket Entry [16-9], however, is confusing because these separately docketed WeChat screenshots are translated to reflect conversations between "Felix J" and Defendant. It might have been helpful for the name discrepancy to have been explained in Jing's affidavit, but that is not the path counsel chose to take. Instead, the Court, piecing together separate exhibits, is left to assume that Fei Jing goes by the name of Felix J when conversing with Sun. This is confirmed by flipping through the four submissions for Fei Jing to confirm the account numbers used for wire transfers. This task would have been made easier by the submissions of a properly explained and clear affidavit. At the very least, it would have been helpful if each Plaintiffs' exhibits were actually "attached" to their affidavits – something Plaintiffs failed to do even in the submission of their courtesy copies. Submissions of each of the individual Plaintiffs suffer from the same shortcomings as those of Plaintiff Jing. The group chat submitted is, as discussed below, even more indecipherable.

In any event, before turning to summarizing each Plaintiffs' claim, and for the District Court's ease of reference, the Court sets forth below a table indicating where to find each Plaintiffs' affidavit and the translated screenshots upon which each relies.

- **Plaintiff Fei Jing**:

    Docket Entry [13-10] (affidavit as to bank wire transfer of $11,500.00);

    Docket Entry [13-3] ("Exhibit 1") (transfer documents);

    Docket Entry [16-1] (affidavit as to WeChat screenshots – appearing under tab "C" of courtesy copy));

Docket Entry [16-9] (WeChat screenshots and translations of conversations with Sun).

- **<u>Plaintiff Luosu Li</u>**:

    Docket Entry [13-11] (affidavit as to bank wire transfer of $23,600.00);

    Docket Entry [13-4] ("Exhibit 2") (transfer documents);

    Docket Entry [16-2] (affidavit as to WeChat screenshots – appearing under tab "D" of courtesy copy);

    Docket Entry [16-10] (WeChat screenshots and translations of conversations with Sun).

- **<u>Plaintiff Jinyu He</u>**:

    Docket Entry [13-12] (affidavit as to bank wire transfers of $23,000.00, $22,600.00 and 144,504 RMB);

    Docket Entry [13-5] ("Exhibit 3") (transfer documents);

    Docket Entry [16-3] (affidavit as to WeChat screenshots – appearing under tab "E" of courtesy copy));

    Docket Entry [16-11] (WeChat screenshots and translations of conversations with Sun);

    Docket Entry [16-15] (WeChat screenshots and translations of conversations with Sun including Plaintiff Wang).

- **<u>Plaintiff Duanyang Wang</u>**:

    Docket Entry [13-10] (affidavit as to bank wire transfers of 111,632 RMB, $22,600.00, $35,300.00 and eight transfers of the same date totaling 360,000 RMB);

    Docket Entry [13-6] ("Exhibit 4") (transfer documents);

    Docket Entry [16-4] (affidavit as to WeChat screenshots – appearing under tab "F" of courtesy copy));

    Docket Entry [16-13] (WeChat screenshots and translations of conversations with Sun);

Docket Entry [16-15] (WeChat screenshots and translations of conversations with Sun including Plaintiff He).

- **Plaintiff Tian Lan**:

    Docket Entry [13-14] (affidavit as to wire transfer of .5 BTC to Sun's digital wallet, $5,000.00 bank wire transfer, two bank wire transfers totaling $4,500.00, and $7,270.00 in two separate PayPal transfers);

    Docket Entry [13-3] ("Exhibit 5") (transfer documents);

    Docket Entry [16-5] (affidavit as to WeChat screenshots – appearing under tab "G" of courtesy copy);

    Docket Entry [16-8] (WeChat screenshots and translations of excerpts from group chat conversations among the "Blockchain Gang" and Sun between July 30, 2020 and August 5, 2020 and November 30, 2020);

    Docket Entry [16-14] (WeChat screenshots and translations of conversations with Sun).

- **Plaintiff Chuyao Feng**:

    Docket Entry [13-15] (affidavit as to transfer of 2 BTC to Sun via OkEx cryptocurrency exchange and $23,400.00 bank wire transfer);

    Docket Entry [13-3] ("Exhibit 6") (wire transfer documents including screenshot of alleged BTC transfer because, as explained, OkEx does not maintain currently accessible trading records);

    Docket Entry [16-6] (affidavit as to WeChat screenshots – appearing under tab "H" of courtesy copy));

    Docket Entry [16-12] (WeChat screenshots and translations).

B.    Defendant

Defendant Sun is an individual who resides in this District. He is alleged to be the operator of a corporation known as Tianyu Capital, Inc., which does business under the RealTrade Institute (or "RTI") name. Defendant and his corporation are located in the State of New York. (Compl. ¶ 17, 19.) Sun is stated to have been a "lecturer" with RTI who offered investment advice to students enrolled therein. Each Plaintiff is alleged to have been one of

Sun's students.  As discussed in greater detail below, Sun held himself out as an expert in the purchase, sale and trading of BTC. Each Plaintiff transferred money, in the form of U.S. dollars, Bitcoin or Chinese currency, to Sun. Plaintiffs were made promises about their purchases, as set forth in greater detail below.

While Sun was selling and making promises regarding the sale of BTC – which is without question a "commodity" – he was never properly registered with any Federal or State regulatory agency. Thus, he never registered as a "futures commission merchant," as required by the CEA. 7 U.S.C. § 6(d)(1); 17 C.F.R. 3.10; see 7 U.S.C. § 1(a)(28) (defining a futures commission merchant). Nor did he register as a "commodity pool operator." 7 U.S.C. § 6(m)(1) (registration requirement); 7 U.S.C. § 1a(11) (defining commodity pool operator). Sun also failed to register as a money services business with the Financial Crimes Enforcement Network ("FinCen"). He similarly failed to register under New York State law with the State Department of Financial Services ("DFS") for a license to deal in virtual currency, known as a "BitLicense." (Compl. ¶¶ 98-105.) The Complaint refers to Sun's awareness of the regulatory landscape that he was avoiding by relying on statements made to Plaintiffs in chats prior to any of them making investments with Sun. Thus, the Complaint states that on July 27, 2020, Sun announced that he would be moving his trading account out of Coinbase, a platform regulated by the United States government, to Okex, a foreign based platform. (Compl. ¶ 106.)

II.    The WeChat Group Chats: The "Blockchain Gang"

Before turning to discuss the individual facts applying to each Plaintiff, the Court discusses their alleged group interactions with Sun. These took place in the form of WeChat group conversations, submitted as Exhibit 8 to the affidavit of Plaintiff Tian Lan ("Lan"), (DE [16-8]), whose individual payments to Sun are discussed below. (DE [16-5]; Courtesy copy

tabbed Exhibit 6). Lan's affidavit states that the WeChat group conversations, appearing as Exhibit 8 to her affidavit, took place among members of a WeChat group formed by Defendant Sun entitled the "Blockchain Gang." The conversations took place between July 30, 2020 and August 5, 2020, and on November 30, 2020 (collectively, the "Group Chat"). Lan states that all Plaintiffs were members of the Blockchain Gang and took part in the Group Chat.

Review and interpretation of the screenshots of the Group Chat is hampered by Plaintiffs' failure to state the identity of those participating in the chat. The original Chinese language chat shows that it takes place among Sun and participants identified only by their profile pictures. The translation refers to speakers sporadically by a name that is unlinked to a speaker or linked simply by the word "photo" and/or "emoji." Thus, while the translator identifies when Sun is speaking, neither the translations, nor any of the affidavits before the Court, bother to link any of the profile pictures in the Group Chat to any of the Plaintiffs. Indeed, not one of the screen names attributed to any of the screenshots appearing in the Group Chat is the name of any of the Plaintiffs. Those screen names might be names used by Plaintiffs in their online investment interactions, but there is simply no way to know. The speculation required to link any of the speakers in the Group Chat to any person becomes clear when reviewing the profile pictures portraying those in the Group Chat appearing as Exhibit 8. These profile pictures and any translations (most have none) are:

- A street scene. (DE [16-8] at 2.)

- The back of a man's head. (DE [16-8] at 2.)

- Ceiling lights (maybe).[2] (DE [16-8] at 14.)

---

[2]     Where the Court indicates "maybe" it is because "maybe" is truly the Court's best guess as to what the picture portrays.

- A man wearing sunglasses (accompanied by a meme of a man wearing sunglasses). (DE [16-8] at 24, 28.)

- A park. (DE [16-8] at 28.)

- A Chinese character. (DE [16-8] at 28.)

- A darkened room identified as "RT warm sheep^2." (DE [16-8] at 34.)[3]

- A pool table identified as "RT LYZ." (DE [16-8] at 32.)

- A picture that appears to be the character "Alf." (DE [16-8] at 34.)[4]

- A meadow identified as "RT Simon." (DE [16-8] at 38.)

- A cartoon of a woman wearing a hat identified as "RT Frank Lin." (DE [16-8] at 38.)

- A blurry night city scene identified as "RT Gary." (DE [16-8] at 36.)

- Sunrise on a mountain (maybe). (DE [16-8] at 48.)

- A person facing sideways identified as RT.L, and maybe in the translation as "Su Cheng." (DE [16-8] at 51.)

- A person's face identified as "cdv." (DE [16-8] at 53.)

- A blue face silhouette identified as "RT A Xi Tai." (DE [16-8] at 53.)

- A Chinese character referred to as "Muzii." (DE [16-8] at 53.)

- A man standing in a street identified as "RT Zezhi" (but also possibly as Su Cheng – who appears to be inquiring as to Australia – where none of the Plaintiffs live). (DE [16-8] at 55.)

- A photo of a woman identified as "Vivienne." (DE [16-8] at 60.)

- A UFO (maybe). (DE [16-8] at 68.)

---

[3]     Where the Court states that a profile picture is "identified as" something, it is because the chat or translation reveals a screen name attached to the picture. As noted, those names are never linked to any of the Plaintiffs.

[4]     "Alf" was the lead character (a puppet) in the 1986-1990 television series of the same name – an acronym for "Alien Life Form" – again, not one of the Plaintiffs. https://en.wikipedia.org/wiki/ALF_(TV_series)

- A man on a mountain in sunshine identified as "junyao." (DE [16-8] at 78.)

- Daytime picture identified as "feifei." (DE [16-8] at 78.)[5]

Also included among the Group Chats submission are the following untranslated bits and pieces:

- Chinese characters translated only as "emojis." (DE [16-8] at 18.)

- "Stickers." (DE [16-8] at 26.)

- A meme showing actor Ryan Gosling clapping. (DE [16-8] at 30.)

- Smiling, laughing, "laughing so hard it is crying," perplexed and skeptical cartoon faces, thumbs up and meowing cat emojis. (Throughout DE [8].)

Defendant Sun is generally described by the translator as Sun Yan, but also, quite inexplicably, as "Contract Elementary School Student." The translator assures the Court that this individual is indeed Sun. There are also profile pictures identified by the translator as Sun's assistant – "RT U.S. Stock Practical Academy Assistant Number 2."

The difficulty in linking any of the submitted Group Chat conversations to any of the Plaintiffs is extreme, if not impossible. Plaintiffs' failure to, at the very least, identify their own screen names makes the chats useless in identifying who was, and who was not, a part of the Group Chat. Certain things, however, can be discerned, and they relate to Defendant Sun. For one thing, it is clear that Sun uses the same profile picture throughout the Group Chat. It is therefore possible to link Sun's profile picture to his statements. Thus, the Court finds that Defendant Sun spoke to a group of people in the Group Chat about investing in BTC. It is also clear that Sun held himself out as some sort of an expert in buying, selling and trading BTC. Percentages accompanying photos that are presumed to be the profile picture used by Sun refer

---

[5]     The Group Chat identifies Sun's assistant as inviting to the group individuals going by the screen names: "all in whenever I disagree," "feifei," "kop," "junyao," "DeBBie," "sue," and "Chen Jie." None of these are identified as Plaintiffs.

to "yield rates" of 148.76%, 170.88%, 224.39% – all on July 3, 2020, accompanied by the advice: "Buy less when the price goes up, do not sell when the price goes down, profit can be made inadvertently." There is also reference to a "net profit rate" of 833.33%.

Sun also communicated a sense of urgency to the group to buy BTC before the price went up. Thus, he appears to advise the group on July 31, 2020 that the price of BTC should "hit 12,000." He later advises against withdrawal of BTC because the price would be increasing at year's end. Sun refers to his "students" as "bosses" and they refer to him as the "Dean." Sun's assistant also refers to Sun as "Dean." Sun touts himself as an extremely wealthy person who needed extra took time off so that he could go shopping for yachts. (DE [16-8] at 30.)

A review of the Group Chat also reveals a disreputable side of Sun's business. Without explanation, Sun insists that investors use only Chinese phone numbers for trading, (DE [16-8] at 49), alludes to questionable tax consequences (DE [16-8] at 49), and states that his type of trading is banned in North America (where, incidentally, all of the Plaintiffs are located) (DE [16-8] at 43, 51). Also questionable is Sun's repeated reference to BTC as "big pancakes" and advising against the use of the term "Bitcoin" in chats.

Sun makes clear his directions to his "students" who might want him to handle Bitcoin purchases on their behalf. Thus, on August 2, 2020, Sun communicated to the Blockchain Gang the following "requirements" for investment:

1.      Multiple phones

2.      At least have 2 big pancakes

3.      Flexible schedule, clear mind, comply with the laws and rules.

It is telling that Sun never discusses any particular laws or rules with which he will comply. Following these requirements, Sun says: "Ten people, principal guaranteed with 30%+ quarterly

dividend." The returned guarantee of principal, i.e., the amount invested, is a theme that Sun

returns to during his WeChat conversations with each individual Plaintiff as discussed below.

III.     Plaintiffs' Individual Chats with Sun and Payments Made

1.      Plaintiff Fei Jing

Plaintiff Jing is a citizen of Canada. He alleges that he wired $11,500.00 to

Defendant for the purchase of 1 BTC. Jing engaged in WeChat communications with Sun

between August 6, 2020 and April 18, 2021. Jing submits screenshots of WeChat conversations

with Sun. In those screenshots, an individual named "Felix J" communicates with Sun. As stated,

the Court assumes, although Plaintiff does not state in his affidavit, that "Felix J" is Jing. In his

conversations with Sun, Jing refers to Sun as "Dean." The screenshots reveal that Sun is referred

to as "Yan Sun."

The first communication between Jing and Sun took place on August 6, 2020. In that

conversation Jing tells Sun that he uses U.S. dollars and asks Sun whether there are "restrictions"

on the transfer of such funds from Canada to the United States. Sun responds that if Jing "don't

know how to buy, no problem. You can buy it from me." He further states that he promises two

things:

1. In 24 hours make a deal with the lowest price, without any price difference fee

2. In 2020 year-end if BTC price is lower than your cost I will pay you back the
price difference, that means I assure principal, guarantee principal and gains.

(DE [16-9] at 3.)

The day after this communication, Sun tells Jing the information for the transfer of bank

funds. Jing then inquires: "Dean, previously you said two Bitcoin then get dividend every quarter

– is that program still around? Or wait around for next round?" Sun responds "No," and then

14

states, "now it is trading on your behalf, <u>guaranteed principal</u>, get dividend, that sort of thing" (emphasis added). (DE [16-9] at 5.)

On August 8, 2020, Jing responds to Sun's question as to how many he needs by saying "one at this moment." Sun then gives Jing an address in Woodbury, New York. Jing then tells Sun that he should see the money in his account within the next 24 hours. (DE [16-9] at 7.)

On August 13, 2020, Jing asked Sun if he had received the "transaction." Sun asks "how much" and Jing responds: "USD 11500" "money for one bitcoin." Sun responds that he has the funds and asks if he should transfer the coin to Jing, who asks Sun if he can "help [him] trade it. This is what you said at the time." (DE [16-9] at 9.) Sun responds "Okay." Jing then asks Sun if there is "any restriction for getting the coins back? Can get it back after half year?" Sun responds "Quarterly, can take out at year-end, <u>actually can get it anytime</u>." (emphasis added).  (DE [16-9] at 9.) On the same day, Sun again assures Jing that he could get his principal at any time. Sun confirmed that he was "operating" the BTC on behalf of Jing, "<u>guaranteed principal</u>, get dividend, similar to that." (DE [16-9] at 13.) Sun also told Jing that he "can take it out at end of the year, in fact can take it anytime." (<u>Id.</u>) (emphasis added).

On December 1, 2020, Jing asks Sun if there will be dividend for Bitcoin at the end of the year. Sun responds the next day saying: "Above $12,000, when old Xu entered, when Okex did not allow withdraw of coins, lost too much with hedging." (DE [16-9] at 15.) Plaintiffs do not explain the meaning of "Old Xu" or Okex" in their papers. The Court is at a loss as to the meaning of "Old Xu." In context, it appears that the reference to Okex is to a foreign platform of the same name for the trading of cryptocurrency such as Bitcoin. In any event, it is clear that Sun was making some sort of excuse for refusing to comply with Jing's direction to make a withdrawal. On December 2, 2020, Jing asks Sun when he can withdraw his coin. Sun tells Jing

to "[h]ave patience and wait till end of year, maybe it will be 20000-24000." (DE [16-9] at 17.)
On December 23, 2020, Jing again asks Sun (referring to him as, as noted, as "Dean") for
withdrawal of funds by the end of the year. (Id.)

The next communication between Jing and Sun took place on February 19, 2020, wherein
Jing refers to Sun's replies as vague. Sun responds that he has to work with "relevant
departments" and makes reference to "frozen accounts." (DE [16-9] at 19.) Jing again
corresponded with Sun on March 1, 2020, asking for an "accurate message." Sun asks for
patience. (Id.) On March 4, 2020, Jing points out to Sun that Sun, himself, had invested many
Bitcoins and wonders whether he is worried about the lack of ability to withdraw funds. On
March 5, 2020, Sun tells Jing he is "more anxious than you guys but need to stay put, currently
should be 6-7w [translated to sixty thousand to seventy thousand], and then back to 10x
[translated to one hundred thousand]. (DE [16-9] at 23.) The last communication between Jing
and Sun took place on April 16, 2020, with Sun asking Jing to increase his position and Jing
responding that it would be good "if this matter can pass, not increasing position." (DE [16-9] at
25.)

2.     Plaintiff Luoso Li

Plaintiff Luoso Li ("Li") is a citizen of the Peoples Republic of China. Li alleges
the wiring of $23,500.00 to Defendant for the purchase of 2 BTC. Li engaged in WeChat
communications with Sun between August 6, 2020 and March 10, 2020.

On August 6, 2020, Li, addressing Sun as "Dean" states that the "money is in place now.
Would you help me to buy 2 coins then keep them with you, then participate in the quarterly
dividend program." Li tells Sun that he will wire transfer funds to Sun, in U.S. dollars. On
August 7, 2020, Sun responded to Li with his banking information. Li transferred funds to that

account for Sun to purchase two Bitcoin. (DE [16-10] at 3.) The price for each Bitcoin is stated in the chat between Li and Sun as $11,800.00. Sun states that there will be a year-end bonus of 25%, "annualized rate is 100%." (DE [16-10] at 7.) Li refers to buying additional BTC in the future and Sun responds that they will "get super rich together." Sun refers to Li as "Boss" and tells Li that they will "harvest at year end." (DE [16-10] at 5.)

On December 17, 2020, Li tells Sun that during that day's livestream, he heard that his coins could be withdrawn at any time. He also tells Sun that he borrowed money from a friend to purchase the Bitcoin, and he would like to pay him back. (DE [16-10] at 8.) Sun responds that Li should "wait until 24W [translated to twenty-four thousand] then withdraw . . . ." Sun again makes reference to his Okex account and to earning a "big profit" if they wait. (DE [16-10 at 9.)

On February 4, 2020, Li, referring to Sun as Dean, asks if he can withdraw his Bitcoin "before Spring festival?" The next day Sun tells Li that he may withdraw "probably after two weeks." (Id.) On March 10, 2020, Li tells Sun that he has an urgent need for funds to repay loans and asks Sun to "please use your current fund to buy two coins then transfer to me." Li gave Sun his Bitcoin wallet address to facilitate the transfer, then heard nothing further from Sun. (DE [16-10] at 11.)

3.  Plaintiff Jinyu He

Plaintiff Jinyu He ("He") is a citizen of the State of California. He alleges that he wired a total of $45,000.00 (in two separate transfers of $23,500.00 each) to Defendant for the purchase of 4 BTC. He also alleges that he transferred 144,504 in Chinese currency to Defendant (via an app) for the purchase of 2 BTC. He submits his affidavit as Exhibit 3 and screenshots of WeChat conversations between himself and Sun's assistant (referred to in the screenshots as "US Stocks Practical Academy Assistant Number 2") between August 10, 2020 and April 4, 2021

(Exhibit 11), as well as a chat among He, Sun and Plaintiff Duanyang Wang ("Wang") (Exhibit 15).

Screenshots of a conversation that took place on August 10, 2020 show that He wired $23,000.00 to Sun's account for 2 BTC. In a communication that appears to have taken place with Sun's assistant before his purchase, He refers to the transfer of "30000 which are two big pancakes," which he says to "give the Dean to manage on my behalf." (DE [16-11] at 3.) He then asks the assistant "If managed on my behalf, when can [I] withdraw?" The assistant replies: "settled quarterly, once at end of the year." (Id.)

On August 11, 2020, Sun's assistant confirmed that $23,000.00 was wired. In response to Sun's assistant's instructions not to write "words like btc Bitcoins in the note," He responded "didn't write, wrote big pancakes 2x." (DE [16-11] at 4.) On August 12, 2020, the assistant confirmed He's transfer of funds and told He that the "Dean will report to everyone quarterly." (DE [16-11] at 6.)

On August 13, 2020, He stated that he wanted to buy two more "big pancakes" and asked for the price. He was told that the lowest price in the last 25 hours was 11,300, and He agreed to transfer 26,000. The assistant then confirmed that He had 2 BTC, "adding two more is four, can withdraw at any time." When He asked how to record the sale, Sun's assistant told He that it would be "just by WeChat and bank records," and confirmed that He currently had 2 BTC that He could withdraw at any time." (DE [16-11] at 7.)

On August 14, 2020, He wired $22,600.00 to Sun's account to purchase an additional 2 bitcoin. The "Dean's" receipt of $22,600.00 was confirmed on August 17, 2020, along with the agreement that he "manage" the BTC on behalf of He. (DE [16-11] at 9.) In September 2020, He

asked about his promised quarterly dividend, which he was assured was calculated as of September 1, 2020. (DE [16-11] at 9).

On October 9, 2020, after reports of big profits, He sought to purchase more BTC from Sun. At that time, He sought to purchase BTC using Chinese currency (Yuan referred to as RMB in screenshots). (DE [16-11] at 11.) He purchased two BTC via the Alipay app. The price was quoted, presumably in U.S. dollars, at $10,800.00 per bitcoin, which was 144,504 RMB. (Id.) This latest purchase of 4 BTC was added to Sun's prior management of He's previously purchased Bitcoin, bringing He's investment with Sun to 6 BTC. (DE [16-11] at 14.)

On Oct. 21, 2020, He was advised by Sun's assistant not to withdraw his BTC until the end of the year. He was told that "the Dean said currently the coins can be taken out uniformly at the end of the year, now coins are all locked." (DE [16-11] at 16.) He responded that the "Dean said before that it can be taken out at any time, but if it's troublesome then never mind." (Id.) The assistant reiterated the instruction to wait until the end of the year. (Id.)

On November 30, 2020, He told Sun's assistant: "The big pancake group is dissolved, are [we] going to withdraw the coins and get dividend?" (DE [16-11] at 16.) In response to his question as to why the group was being dissolved, He was told "Reached 20000, the Dean has said before." He replied: "Yeah, I thought it's dismissed and everyone takes out the coins and leaves." (Id.) On December 17, 2020, He again sought to confirm the ability to withdraw his BTC at the end of the year. He was told "All at year end." (DE [16-11] at 17.) Again, on December 18, 2020, He sought to confirm his ability to withdraw his investment and was again told "Yeah all at the end of the year." (Id.) He continued to communicate with Sun's assistant, on an almost daily basis, through the end of 2020. On December 23, 2020 Sun's assistant said,

"Yeah the Dean said early January, after the accountant completes the year-end settlement," making a vague reference to accounting for the payment of taxes. (DE [16-11] at 20.)

In response to He's January 4, 2021 communication, Sun himself (and not his assistant) responded, saying, "Boss happy new year, will let you know if there is any news." (DE [16-11] at 22.) Apparently speaking on behalf of the group (the "Blockchain Gang"), He asked whether the Dean was having any difficulties and offered to accept payment in installments. Sun told He if he was not satisfied with the "current arrangement" he could "return [He's] principal at any time." (Id.) He again communicated his desire to withdraw "his big pancakes" on January 16, 2021 and was advised, this time by Sun (not his assistant who was previously identified as the communicant on the WeChat thread that is Exhibit 11), "No big problem, need everyone to cooperate." (DE [16-11] at 23.)

Similar conversations took place throughout February 2021, with Sun telling He "Need to cooperate relevant departments to do some work, waiting for the accounts to be unlocked," and "once unlocked there will be no problem." (DE [16-11] at 25, 27.) On February 26, 2021, He was told "Nothing for now." (DE [16-11] at 27.) On March 1, 2021, Sun told He, "I'm definitely more miserable than you are. Will give you an implementable response tomorrow." (DE [6-11] at 31.)

Throughout March of 2021, Sun again put off He, telling him he had to meet with his accountant, and later with his lawyer. On March 5, 2021, He told Sun that his family was waiting, and "what on earth is going on with the coins purchased? Any problem with cashing out? Another week has passed." (DE [16-11] at 33.) At the end of March 2021, Sun told He that "someone probably transferred dirty money," and that he was "cooperating with relevant departments to investigate now." He was told to "wait patiently" and that he might need to

"cooperate with the investigation." (DE [16-11] at 43.) On March 29, 2021, He said: "Dean to be honest, the situation right now, coins are frozen at your end, and have no specific plan to withdraw coins. We only have WeChat as the only channel to contact [the group has been canceled]. It is highly risky for the safety of personal assets." (DE [16-11] at 45.) He went on to seek a solution. Sun's last response to He stated that Sun did not have "the power" to decide now." (Id.) On April 4, 2021, Sun told He that he was going back to China. (DE [16-11] at 49.) That was the last He heard from Sun.

He also submits screenshots of WeChat conversations stated to be among himself, Plaintiff Wang (who is presumably the "Tiger" referred to in the Group Chat – but it is hard to tell since there is no explanatory affidavit), and Sun that took place between April 8, 2020 and April 13, 2021, as Exhibit 15. The Group Chat is identified as the "btc Communication Group (2)." (DE [16-15] at 3.) On April 8, 2021, He, speaking for himself, "Tiger" and "the several classmates who purchased" BTC advised Sun of the "need to communicate with you regarding the situation of the coins purchased with you and the progress of the coins withdrawal." He goes on to say that it was his understanding that the coins were "frozen" and "cannot be withdrawn as agreed and have been delayed for over 3 months." He refers to his needs and those of his classmates for money. He states that Sun "has never clearly communicated with [the group] which made them all feel sad." He states that he, along with "around 20 btc investors in total, request that you the Dean give [them] some substantive progress to put [them] at ease." (DE [16-15] at 9.) Joining the Group Chat, Wang states that he was waiting for the money to buy his kids a house. (DE [16-15] at 3.) On April 10, 2021, Sun stated that he would "respond uniformly later." (DE [16-15] at 5.) Wang again chatted asking for proof of any frozen account and offering to negotiate with Sun to work out any issues of confidentiality or "negative influence." (DE [16-

21

15] at 5.) The group refers to Sun's plan to go to China in May but expresses disappointment and requests a response that day.

Sun responded to the group on April 11, 2021, stating that he would be going to China, things might be resolved by June and stating that if the group wanted to help they should "1. wait patiently; 2. Provide proof of funds." (DE [16-1] at 7.) Wang asked if the group's provision of proof of funds would be met by Sun's proof that the coins were frozen. (DE [16-15] at 7.) The group continued to try to communicate with Sun through April 13, 2021, but Sun did not respond. The last chat in this group came from Wang stating: "Dean, we've always trusted you very much, but this matter really hurts our feelings. We don't want any more delay, and go on every day living without seeing any hope. Please provide the proof of freezing of the Okex accounts within one day, otherwise we will protect ourselves through legal means." There was no response to this last chat. (DE [16-15] at 9.)

4.    <u>Plaintiff Duanyang Wang</u>

Plaintiff Wang is a Chinese national. She alleges that she transferred 23,200 in Chinese currency – which is stated to be the value of 2 BTC – to Defendant. She also alleges that her husband wired $22,600.00 to Sun to purchase 2 BTC and that she wired $35,300.00 to Sun to purchase 2 BTC. She further states that she made an additional eight transfers in Chinese currency to purchase 2 BTC. (Compl. ¶ 13.) Wang states that she and her husband, Han Zhang (who is not a Plaintiff herein), communicated with Sun. Wang submits screenshots of the WeChat conversations stated to be among herself, her husband and Sun, which took place between August 10, 2020 and January 5, 2021, as Exhibit 13. Wang also swears to the accuracy of screenshots of the group WeChat conversations among Wang, her husband, Plaintiff He and Sun, discussed above.

It appears from the WeChat exhibits that Wang might use a screen name that translates to "Go up the mountain and fight the tiger." This is hard to tell since there is no affidavit testimony to this fact – a fact that, like Plaintiff Jing's WeChat name – would have been helpful to know. Wang began communicating with Sun on August 10, 2020. On that day, she was advised by Sun that she could purchase BTC for U.S. $11,500.00 each. (DE [16-13] at 4.) After Wang told Sun that she could buy Bitcoin herself, she agreed to Sun's offer to purchase BTC for her in either U.S. dollars or Chinese currency. (Id.) At that time, Sun advised Wang that the price of a single Bitcoin was now $12,000.00, but he would agree to a price of $11,600.00. Wang agreed to have Sun purchase 2 BTC in Chinese currency via the Alipay app. Responding to the receipt of Wang's funds, Sun, referring to Wang as "Boss" said that they would soon have "year end harvesting!" (DE [16-13] at 12.)

On August 13, 2020, Wang's husband, Han Zhang, spoke to Sun, inquiring as to the current price of BTC. Sun responded that the "lowest price" in the past 24 hours was 11,300 depending upon "how much you want." On August 14, 2020, Zhang instructed Sun to purchase two BTC on his behalf.  (DE 16-13] at 14.) Like Plaintiffs, Wang's husband referred to Sun as "Dean." Wang transferred $22,600.00 to Sun on August 16, 2020. (DE [16-13] at 16.) On November 25, 2020, Wang communicated with Sun regarding an additional purchase of BTC. On December 10, 2020, Sun told Wang that the lowest price for one BTC was $17,650.00, and Wang agreed to that price. (DE [16-13] at 20.)

On January 4, 2021, Wang communicated via WeChat with Sun's assistant identified in the WeChat screenshot as "US Equity Real Trade Institute Assistant Xiao Er," asking if her investment was protected if she purchased her BTC recently. She was told "that is fine," and was also told that "all are 3 months, with 30,000 guaranteed." The assistant also told Wang that

23

previous chat records were "lost" and requested account information. (DE 16-13] at 26, 28.) Wang expressed an interest in purchasing BTC in Chinese currency, referred to as RMB, and asked for the current exchange rate. The assistant told Wang there was "no time to lose, I also bought two." (DE 16-13] at 26.) When Wang faced an apparent delay in the transfer of funds, the assistant told her the price would change by 12 AM, but that 27,800 would be reserved for her. (DE [16-13] at 32.) The Court is unclear as to the meaning of "27,800," but it may refer to the price for the purchase of the 2 BTC that Wang later bought.

Wang also relies on Exhibit 15 (the WeChat screen shot including Plaintiff He). The substance of this conversation is detailed above in connection with He's claimed demand to Sun for a withdrawal of funds.

> 5.   Plaintiff Tian Lan

Plaintiff Lan is a citizen of the State of Washington. He alleges that he transferred .5 BTC to Defendant, along with three separate U.S. currency transfers to Defendant's wife to purchase a total of 2 BTC. (Compl. ¶ 14.) As noted above, it is Lan who submits the translated WeChat screen shots of conversations among the members of the Blockchain Gang (DE [16-8]). Lan also submits WeChat screenshots of chats between himself and Sun. (DE [16-14].)

The conversations between Sun and Lan refer to the method of payment via the app Zelle and to Sun's email address to facilitate those payments. (DE [16-14] at 7.) Like his conversations with other Plaintiffs, Sun refers to Lan as "Boss," telling her a purchase was "just in time," and that they had "just added another rich guy . . . ." (DE [16-14] at 13.) Lan, in an apparent reference to an aggressive investment strategy refers to "playing hard." (DE [16-14] at 17.) After making several purchases, Sun tells Lan that each BTC purchased will "give 0.3 BTC dividend each quarter," so that by years' end Lan will have "0.6 BTC." (DE [16-14] at 25.)

On December 15, 2020, Sun refers to his guarantee of principal, stating that at the end of the year "can also guarantee principal increased to 20000 or 24000 per coin." To which Lan states that she had "scraped together two coins" for tuition. (DE [16-14] at 29.) Lan discusses the tax implications of the investment when she asks whether to sell in U.S. dollars. Sun advises that the sale be made in RMB, and Lan replies: "Do not plan to sell for now, otherwise tax reporting can be very troublesome." (Id.)

On January 6, 2021, in response to Lan's concerns, Sun tells Lan to "relax," that he "has some tax issues" that need to be figured out with his accountant.  (DE [16-14] at 31.) On January 11, 2021, Sun tells Lan that he needs time to sell and that he "cannot transfer out right now." (DE [16-14] at 33.) Sun again asks for more time on January 21, 2021. (DE [16-14] at 35.)

On February 18, 2021, Sun assures Lan that he will tell her "immediately if there's any news." (DE [16-14] at 37.) On that same day, Lan, seeking withdrawal, tells Sun:

> Dean, I don't know what obstacles you encountered regarding the coin withdrawal, but considering your wealth, I believe you can at least take out 2 coins. But I don't want to make Dean uncomfortable right now. Dean how about returning 1 coin to me first, so that I can feel at ease, the other coin can be returned later.

(DE [16-14] at 37.) The next day, Lan again requests withdrawal, stating:

> Dean, I saw that there is still 0.02 coin in your account to which I originally transferred the 0.5 coin. If you can return 0.02 coin to me first, that would also be great. I can also accept the rest paid by USD. The current reference coin price is about 50,000 USD, returning to me the rest 0.98 coin by converting into USD also works for me. Of course, transferring coins to me directly works best.

(DE [16-14] at 39.)

Lan continues to ask Sun the reason for not returning the Bitcoin that she transferred. On February 19, 2021, Sun responds that he needs cooperation and that "relevant departments" need to do "some work" and that "accounts need to be unlocked." (DE [16-14] at 41.)  One month later, on March 19, 2021, Lan again reaches out to Sun. Sun, again putting Lan off, states (as he

25

said to Plaintiff He) that someone may have transferred "dirty money." (DE [16-14] at 43.) This was the final communication that Lan had with Sun.

      6.   <u>Plaintiff Chuyao Feng</u>

      Plaintiff Chuyao Feng ("Feng") is a citizen of the State of Georgia who alleges two separate transfers to Defendant for the purchase of 2 BTC. (Compl. ¶ 15.) In particular, Feng transferred 2 BTC to Sun via the OkEx cryptocurrency exchange, and $23,400.00 via bank wire transfer for a total purchase of 4 BTC.

      Screen shots of conversations between Feng and Sun begin with Sun telling Feng that the current quarterly dividend for BTC is 25% - so that each quarter yields a dividend of 0.5 BTC. (DE [16-12] at 3.) Sun later tells Feng that "if BTC reaches 15000-20000 within the year that means will be rich." In response, Feng says" "Quoted on Dean's good words, let's get rich together." (DE [16-12] at 9.)

      On August 4, 2020, Sun acknowledges the receipt of 2 BTC from Feng, referring to him as "boss," and assuring him a dividend at the end of the year. Feng thanks Sun for "showing him the ropes." (DE [16-12] at 11.) On August 19, 2020, after being asked about the dividend, Sun tells Feng that while he could not "guarantee there will be high dividend," he can "guarantee for sure to keep to the base amount and the principal." (DE [16-12] at 13.) Sun also assures Feng that he can withdraw his Bitcoin at any time and that the price of Bitcoin will "not be lower than your cost at the end of the year." (DE [16-12] at 17, 21.) Sun also tells Feng that the amount invested as principal is guaranteed. (DE [16-12] at 21.) He also tries to assure Feng that he is somehow special, telling Feng "don't tell anyone, or else they will come and bother me." (<u>Id.</u>) Feng holds Sun to the guarantee, saying: "Dean, guarantee principal and showing the ropes, not

26

asking too much." (DE [16-12] at 23.) After this conversation, Feng transferred $23,400.00 to Sun. (DE [16-12] at 27.)

On December 28, 2020, Sun tells Feng that there will be no dividend paid because of a problem with his tax return "due to the big rise when Xu joined, when okex did not allow withdrawal of coin, too much damages with hedging." (DE [16-12] at 31.) In January of 2021, Feng asks whether there would be any withdrawal of BTC and Sun responds: "Wait until I finish coaxing the kid then I will get back to you." (DE 16-12] at 33.) Feng notes that there was no response by the next day, and tells Sun (addressing him as "Dean") to give him a "shout" when available. (DE [16-12] at 35.)

On January 14, 2021, Feng tells Sun:

> Dean, I thought about it after you told me that day, for those two coins I bought with you, I would like to have the coins back, if there are tax issues then I will transfer the money to you, or I can settle the tax issue with you at the market price minus the purchase price,  because I do not have RMB anymore, also I would like to manage the coins at okex. I would like to get them all back like this with the other two that were transferred to you.

(DE [16-12] at 35.) Feng again asks Sun for the status of his investment on February 6, 2021. Sun responds that he needs time. (DE [16-12] at 37.) On February 19, 2021, Sun tells Feng that the funds are "restricted' but that he is still "working on it." (Id.) On March 27, 2021, like his communications with the other Plaintiffs, Sun explains away the failure to allow withdrawal of Bitcoin on the transfer of "dirty money."  (DE [16-12] at 39.) On April 19, 2021, Sun repeats that he cannot transfer funds "at this moment," but hopes that it will be "unblocked" in May. (DE [16-12] at 41.) Feng's last communication with Sun, seeking information regarding BTC took place on September 21, 2021. (Id.)

C.    Summary of Facts Regarding Plaintiffs' Interactions with Sun

Plaintiffs communicated with Defendant only via WeChat. Sun, in his position as the head of RTI, gave advice about investing in BTC to Plaintiffs. Defendant touted his trading prowess by posting screen clips of alleged gains in the value of Bitcoin. Sun regularly assured Plaintiffs that the principal amount each invested was guaranteed to be protected. Thus, Plaintiffs were told repeatedly that their investments with Sun were without risk, i.e., each was guaranteed a full return of principal, or the Bitcoin purchased at any time, on demand. Plaintiffs were also told of unspecified quarterly dividends. With the exception of quoting a price for each BTC at the time of investment, no Plaintiff was ever told of any change in the value of their particular investment. Thus, Sun never told any Plaintiff, and none can allege, the amount of any promised quarterly dividend. Not only were dividends unpaid, Sun appears to have absconded with each of Plaintiffs' investments.

Plaintiffs all had to be aware of the risks of trading in Bitcoin, but were willing to take those risks because of Sun's repeated assurances. Plaintiffs apparently believed Sun's screenshots showing fantastical profits and that Sun only took breaks from trading so that he could go shopping for yachts and/or to harvest silver and gold. Each bought into Sun's communicated sense of urgency to get in on the purchase of BTC because quoted prices (which were not guaranteed) could rise at any moment.

Any reading of the Complaint and the screenshot conversations submitted leads to the inescapable conclusion that Plaintiffs knew there was something inscrutable about Defendant's business. Thus, while Plaintiffs unquestionably knew they were investing in BTC, they all agreed to refrain from referring to BTC as bitcoin. Instead, Plaintiffs all agreed to refer to BTC as "big pancakes." At least one Plaintiff (Plaintiff He) expressed concern over regulatory matters,

28

wondering whether there were "restrictions" on the transfer of funds from Canada to China. However, neither He, nor any other Plaintiff ever asked Sun whether he was registered with any government, foreign or domestic, to trade in BTC. Nor did they ask for any confirmations of their supposed risk-free investments. Additionally, no Plaintiff ever questioned the required use of multiple Chinese phones to make their transactions. Instead, all Plaintiffs were willing to transfer large sums of money to Sun so that they could reap the quick and guaranteed rewards of trading in Bitcoin.

According to the Complaint, the digital wallet used by Sun to receive BTC from those Plaintiffs who paid in that currency (Plaintiffs Lan and Feng) contained, as of the date of the filing of this action, only 0.05 BTC. (Compl. ¶ 97.) While Plaintiffs apparently have the ability to see what Sun owns, they have been unable to communicate with him and he never answered their final requests to withdraw their investments, or in any way obtain the guaranteed return of principal. Instead, at the end of the day – or the scheme – Plaintiffs received neither the guaranteed return of principal nor the untold fortunes they expected. Instead, they received nothing and lost everything.

D.    Plaintiffs' CEA Causes of Action[6]

Plaintiffs' Complaint alleges two counts of private rights of action under the CEA. Count I of the Complaint alleges violation of Sections 4b, 4d, 4m and 6(c) of the CEA, 7 U.S.C. §§ 6b, 6d, 6m and 9, Regulation 3.10, 17 C.F.R.§ 3.10, and Regulation 108.1(a), 17 C.F.R. §180.1(a). Taken together, these provisions either require registration of certain

---

[6]    The Complaint alleges causes of action pursuant to the CEA as well as state law causes of action. The papers submitted in support of Plaintiffs' motion address only the CEA claims. In view of the fact that Plaintiffs had more than ample opportunities to brief their state law causes of action but have chosen only to pursue their CEA claims, the Court will not address the state law claims and considers those claims to have now been abandoned.

individuals who deal in commodities or are anti-fraud provisions. Generally, the anti-fraud provisions in Count I make it unlawful to make false or misleading statements or omissions in connection with the purchase or sale of commodities in interstate commerce. The false or misleading statements forming the basis of Plaintiffs' claims set forth in Count I are: (1) Sun's failure to disclose his lack of registration under the Federal and State laws described above – as a commodities merchant, pool operator, as a money services business under FinCen or as engaged in a virtual currency business (collectively referred to herein as the "lack of registration" claims); (2) statements concerning guaranteed return of principal and return of dividends; and, (3) statements concerning the cause of the refusal to return Plaintiffs' funds and/or BTC. (Compl. ¶ 118.)

Count II of the Complaint alleges that Sun violated Section 4o(1)(B) of the CEA, an anti-fraud provision which makes it unlawful for a "commodity pool operator" to engage in practices that operate as a fraud on their client (the "Section 4o Claim"). See 7 U.S.C. § 6o(1)(B) (codification of Section 4o(1)(B)). (Compl. ¶¶ 121-22.) The Section 4o Claim alleges broadly that Sun's BTC trading operation worked as a fraud or deceit upon Plaintiffs, "whose participation he induced through false or misleading statements or omissions." (Compl. ¶ 123.)

Having described the parties, summarized the facts, and set forth the claims upon which Plaintiffs seek judgment, the Court turns to the relevant legal standards, leaving further amplification of the facts as necessary to the discussion below.

<u>DISCUSSION</u>

I.    <u>Legal Standard for Entry of Default Judgment</u>

    A.    <u>Standard for Entering a Judgment of Default</u>

        Rule 55 of the Federal Rules of Civil Procedure employs a two-step process

before entering a judgment of default against a party that fails to respond or defend.  See Fed. R. Civ. P. 55; see also Romero v. Floris Constr., Inc., No. 1:16-CV-4282, 2017 WL 5592681, at *2 (E.D.N.Y. Nov. 20, 2017).  First, the party seeking a judgment of default must ascertain a certificate of default from the Clerk of the Court.  See Fed. R. Civ. P. 55(a).  After the Clerk issues a certificate, the moving party then requests entry of a judgment of default.  See id. at 55(b); see also Coley v. Vanguard Urban Improvement Ass'n, Inc., No. 12-CV-5565, 2018 WL 1513628, at *2 (E.D.N.Y. Mar. 27, 2018), as amended (Mar. 29, 2018).

Where a default occurs, the well-pleaded factual allegations set forth in the Complaint are deemed to be true.  See Greyhound Exhibitgroup, Inc. v. E.L.U.L Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992); see also Fed. R. Civ. P. 8(b)(6) ("An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied").  However, "[i]t is well established that a party is not entitled to a default judgment as a matter of right; rather the entry of a default judgment is entrusted to the sound discretion of the court."  Allstate Ins. Co. v. Howell, No. 09-cv-4660, 2013 WL 5447152, at *1 (E.D.N.Y. Sept. 30, 2013).

A plaintiff seeking a default judgment must demonstrate that its "uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action."  Gunawan v. Sake Sushi Rest., 897 F. Supp. 2d 76, 83 (E.D.N.Y. 2012).  In determining whether to grant a default judgment, the Court has the "responsibility to ensure that the factual allegations, accepted as true, provide a proper basis for liability and relief."  Ferrara v. Tire Shop Ctr., No. 14-cv-4657, 2015 WL 3562624, at *2 (E.D.N.Y. Apr. 6, 2015).  Accordingly, the Court must determine whether a plaintiff's allegations establish liability as a matter of law.  See City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011) ("[P]rior to entering

default judgment, a district court is required to determine whether the [plaintiff's] allegations

establish the [defendant's] liability as a matter of law.") (internal quotation omitted).

> B.    <u>Standard Applicable to a Damages Award Following Default Judgment</u>

Unlike allegations pertaining to liability and proximate cause, allegations set forth

in connection with damages are not deemed admitted on account of a defendant's default.  <u>See,</u>

<u>e.g.</u>, <u>Greyhound Exhibitgroup</u>, 973 F.2d at 158; <u>Olvera v. Los Taquitos Del Tio Inc.</u>, No. 15 Civ.

1262, 2015 WL 3650238, *1 (E.D.N.Y. June 11, 2015); <u>Guaman v. Krill Contracting, Inc.</u>, No.

14-CV-4242, 2015 WL 3620364, at *2 (E.D.N.Y. June 9, 2015); <u>CFTC v. Rolando</u>, 589 F. Supp.

2d 159, 168 (D. Conn. 2008).  Instead, a plaintiff seeking damages from a defaulting defendant

must prove entitlement to damages to a "reasonable certainty."  <u>Olvera</u>, 2015 WL 3620364, at

*1.  Reasonable certainty means that "damages may not be merely speculative, possible or

imaginary, but . . . directly traceable to the breach, not remote or the result of other intervening

causes."  <u>Credit Lyonnais Sec. (USA) Inc. v. Alcantara</u>, 183 F.3d 151, 153 (2d Cir. 1999).  While

the party seeking damages is entitled to all reasonable inferences from the evidence it offers, a

court must "ensure that there is a basis for the damages sought by a plaintiff before entering

judgment in the amount demanded."  <u>Avelar v. Quiros, Inc.</u>, No. 13-CV-7017, 2015 WL

1247102, at *5 (E.D.N.Y. Mar. 18, 2015); <u>Rodriguez v. Almighty Cleaning, Inc.</u>, 784 F. Supp.

2d 114, 125 (E.D.N.Y. 2011) (citing <u>Au Bon Pain Corp. v. Artect, Inc.</u>, 653 F.2d 61, 65 (2d

Cir.1981)).

The court determining damages has the discretion to hold an evidentiary hearing.  <u>See</u>

Fed. R. Civ. P. 55(b)(2); <u>see also</u> <u>Castellanos v. Deli Casagrande Corp.</u>, No. CV 11-245, 2013

WL 1207058, at *3 (E.D.N.Y. Mar. 7, 2013), <u>adopted by</u>, 2013 WL 1209311 (E.D.N.Y. Mar. 25,

2013).  Such a hearing is not required, however, so long as documents submitted, such as

detailed affidavits, allow the court to conduct an inquiry sufficient to establish damages to a reasonable certainty.  See Avelar, 2015 WL 1247102, at *7.

II.     Legal Standards for Liability Pursuant to the CEA

The Commodity Exchange Act, as amended by Congress in 1974, 7 U.S.C. § 1 et seq., established the Commodity Futures Trading Commission and established a statutory scheme governing the trading of commodity futures. See Ping He Co. v. NonFerrous Metals (USA), Inc., 22 F. Supp. 2d 94, 102 (S.D.N.Y. 1998), vacated in part on other grounds, 187 F.R.D. 121 (S.D.N.Y. 1999). As a virtual currency, Bitcoin is a commodity regulated by the CFTC. See CFTC v. McDonnell, 332 F. Supp. 3d 641, 651 (E.D.N.Y. 2018). The CEA was enacted in part to address "concerns of widespread abuses in commodity futures trading, and in order to protect investors amid 'the volatile and esoteric futures trading complex.'" Song v. Yao Bros. Grp. LP, No. 10 Civ. 04157, 2013 WL 12109109, *7 (S.D.N.Y. July 30, 2013) (quoting CFTC v. Schor, 478 U.S. 833, 836 (1986)). A "crucial purpose of the Act is 'protecting the innocent individual investor – who may know little about the intricacies and complexities of the commodities market – from being misled or deceived.'" U.S. Commodity Futures Trading Comm'n v. PMC Strategy, LLC, 903 F. Supp. 2d 368, 376 (W.D.N.C. 2012) (quoting CFTC v. R.J. Fitzgerald & Co., Inc., 310 F.3d 1321, 1329 (11th Cir. 2002)). The Act ensures "fair practice and honest dealings of the commodity exchanges" and provides "a measure of control over those forms of speculative activity which often demoralize the markets to the injury of producers, customers, and the exchanges themselves." Song, 2013 WL 12109109, at *7 (quoting Bartels v. Clayton Brokerage Co., 631 F. Supp. 442, 446 (S.D.N.Y. 1986)). Among the Act's tools in ensuring fair commodities markets are registration requirements, as well as anti-fraud provisions geared

toward protecting investors from false and misleading statements, omissions and deceptive conduct by any means whatsoever.

III.   Private Rights of Action Pursuant to the CEA

In addition to governmental enforcement of the CEA, the Act provides for a private right of action. See 7 U.S.C. § 25(a)(1). Venue for such an action lies, inter alia, in the Federal District where Defendant does business. See 7 U.S.C. § 25(c). In addition to showing a violation of the Act, a private CEA plaintiff can recover only if they show "actual damages" caused by a violation of the Act. 7 U.S.C. § 25(a)(1); Song, 2013 WL 12109109, at *10. With respect to such damages, "a plaintiff must show that the CEA violation proximately caused the damages for which the plaintiff seeks relief." Song, 2013 WL 12109109, at *11; Ping He, 22 F. Supp. 2d at 107. Application of the proximate cause requirement means that private plaintiffs (unlike the CFTC in an enforcement action that seeks no restitution) must show not only false statements, but also reliance on such statements. See R.J. Fitzgerald & Co., Inc., 310 F.3d at 1328 n.6; Indosuez Carr Futures, Inc. v. CFTC, 27 F.3d 1260, 1264 (7th Cir. 1994); CFTC v. Rosenberg, 85 F. Supp. 2d 424, 447 (D.N.J. 2000).

IV.   Plaintiffs' Claims

As noted, Plaintiffs allege that Defendant violated several sections of the CEA. All are based on the alleged making of false or misleading statements in violation of the Act. The allegedly false statements and omissions are pled with particularity in the Complaint as follows:

- Failure to disclose Sun and RT[I]'s lack of registration with Commodity Futures Trading Commission as a futures commodity merchant;

- Failure to disclose Sun and RT[I]'s lack of registration with Commodity Futures Trading Commission as a commodity pool operator;

- Failure to disclose Sun and RT[I]'s lack of registration with FinCEN as a money services business;

- Failure to disclose Sun and RT[I]'s lack of licensure with the New York State Department of Financial Services as a person or entity involved with a "virtual currency business activity;"

- Making false or misleading statements or omissions concerning guaranteed return of principal, returns, or dividends; and,

- Making false or misleading statements or omissions concerning the cause of Sun's refusal to return Plaintiffs' funds and/or Bitcoin.

(Compl. ¶¶ 118-120.)[7]

The falsities relied upon can be grouped according to two categories: (1) false omissions regarding Sun's status as registered under state and Federal law (either with the CFTC, FinCen or DFS); and, (2) false statements or omissions regarding guaranteed return of principal, returns, and/or dividends, as well as those regarding Sun's failure to return Plaintiffs' funds.

For the reasons that follow, the Court recommends holding that the well-pleaded allegations of the Complaint do not plead any CEA claim of damages based upon a lack of registration. This is because Plaintiffs do not plead the necessary element of proximate cause. However, the Court further recommends that the well-pleaded allegations of the Complaint do properly plead a claim for damages for violation of the broadest of the anti-fraud provisions (and the applicable regulation promulgated thereunder) of the Act. Specifically, the Court recommends holding that Plaintiffs are entitled to damages as a result of Sun's violation of Section 6(c)(1) of the Act (codified at 7 U.S.C. § 9), and the regulation promulgated thereunder (codified in 17 C.F.R. 180.1(a) and hereinafter referred to as "Regulation 180.1"), which make it

---

[7] Plaintiffs allege commodities fraud and therefore are required to plead their claims with the particularity required by Rule 9 of the Federal Rules of Civil Procedure. See Wu v. Bitfloor, Inc., 460 F. Supp. 3d 418, 423 (S.D.N.Y. 2020); CFTC v. Kraft Foods Grp., Inc., 153 F. Supp. 3d 996, 1008 (N.D. Ill. 2015).

unlawful for any person to use or employ, in connection with the sale of a commodity, "any manipulative device or contrivance in contravention of" the rules of the CFTC. 7 U.S.C. § 9(1).[8]

V.    Elements of the Relevant CEA Claim: Section 6(c) of the Act

While Plaintiffs allege claims for failure to register and pursuant to several anti-fraud provisions of the CEA, the Court finds it necessary to discuss only the elements of the claim recommended to be held as well-pleaded. That, as noted, is the broad anti-fraud provision contained in Section 9 of the CEA, 7 U.S.C. § 6(c)(1), and the regulation promulgated thereunder, 17 C.F.R. 180.1.

To prove a violation of Section 6(c)(1) of the Act, and Regulation 180.1(a), a plaintiff must show that the defendant engaged in prohibited conduct (including for example, a fraudulent scheme, material misrepresentations, misleading statements or omissions, or the operation of a business that operated as a fraud), with scienter, and in connection with a contract for sale of a commodity in interstate commerce. See McDonnell, 332 F. Supp. 3d at 717. Courts apply the same standards in determining these elements of Section 6(c) commodities fraud as those applied under the anti-fraud provision of Section 4b of the Act, codified at 7 U.S.C. § 6b. See CFTC v. Southern Trust Metals, Inc., 894 F. 3d 1313, 1325 (11th Cir. 2018) (referring to the anti-fraud provisions of 7 U.S.C. § 6b(a), 7 U.S.C. § 9, and 17 C.F.R. § 180.1 as requiring the same elements of proof and, for purposes of summary judgment, "redundant").

_____

[8]    Because there are clearly pleaded violations of Sections 9 of the CEA, it is unnecessary to discuss with specificity the other anti-fraud provisions of the CEA alleged in the Complaint: Sections 4b (a CEA anti-fraud provision that is nearly identical to the fraud provision forming the basis for this recommendation), 7 U.S.C. § 6b, and Section 4o (an anti-fraud provision which applies to commodity pool operators), 7 U.S.C. § 6(o).

"Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding' of the information conveyed." McDonnell, 332 F. Supp. 3d at 717 (quoting R.J. Fitzgerald & Co., 310 F.3d at 1328) (additional citation omitted) (Section 6(c)); see also Rolando, 589 F. Supp. 2d at 168 (Section 4(b)). Statements "should be viewed through the eyes of an 'objectively reasonable' person who would interpret the overall message." McDonnell, 332 F. Supp. 3d at 717 (citation omitted). A statement is material "if a reasonable investor would consider it important in deciding whether to make an investment." McDonnell, 332 F. Supp. 3d at 720 (quoting Southern Trust Metals, 894 F.3d at 1327.)

Scienter "is established when an individual's acts are performed with an intent to deceive, manipulate, or defraud, or engaged in with knowing misconduct." Rolando, 589 F. Supp. 2d at 169 (Section 4b). Acts taken with scienter are "intentional as opposed to accidental." Rolando, 589 F. Supp. 2d at 169. Regulation 180.1 defines scienter to include conduct that is intentional or reckless. 17 C.F.R. § 180.1; McDonnell, 332 F. Supp. 3d at 721 (Section 6(c)); CFTC v. Kraft Foods Grp., Inc., 153 F. Supp. 3d 996, 1015 (N.D. Ill. 2015); see also Drexel Burnham Lambert, Inc. v. CFTC, 850 F.2d 742, 748 (D.C. Cir.1988) (finding that recklessness satisfies Section 4b's scienter requirement). Scienter exists "if a defendant intended to defraud, manipulate, or deceive," or if their "conduct represents an extreme departure from the standards of ordinary care." McDonnell, 332 F. Supp. 3d at 721 (citations omitted). Thus, scienter is established "when an individual's "conduct involves intentional omissions or misrepresentations that present a risk of misleading customers, either known to the defendant or sufficiently manifest that the defendant must have been aware of the risk." R.J. Fitzgerald & Co., 310 F.3d at 1328 (internal quotation marks omitted).

Finally, the "in connection with" requirement of Section 6(c) and Regulation 180.1 is construed broadly. Courts construe this requirement, like the other elements of commodities fraud, in the same way construed when determining claims of securities fraud under Section 10(b) and Rule 10b-5, promulgated thereunder. See McDonnell, 332 F. Supp. 3d at 722-23. In that context, statements that are made to be reasonably calculated to influence an investor are deemed to have satisfied the "in connection with" requirement. See SEC v. Credit Bancorp., Inc., 195 F. Supp. 2d 475, 491-92 (S.D.N.Y. 2002). In the context of commodities fraud, the requirement is satisfied even if the only conduct alleged is recommending a third party as a commodities broker, CFTC v. Vartuli, 228 F.3d 94, 102 (2d Cir. 2000), or even "in cases involving 'completely fictitious' securities transactions." In re J.P. Jeanneret Assocs., Inc., 769 F. Supp. 2d 340, 361-63 (S.D.N.Y. 2011).

VI.     Disposition of the Motion

As noted above, while the well-pleaded factual allegations in the Complaint pertaining to liability are deemed to be true, the Court must determine whether those facts constitute any legitimate CEA cause of action, and whether there is a basis for damages sought.  As also noted, private plaintiffs asserting claims under the CEA must show "actual damages" that are "caused by" the violation alleged. 7 U.S.C. § 25(a)(1). Thus, the well-pleaded allegations of the Complaint must show a violation of the CEA and damages, as well as showing that the CEA violation "proximately caused the damages for which the plaintiff seeks relief." Ping He, 22 F. Supp. 2d at 107. For each claim then, Plaintiffs' allegations must show both the well-pleaded violation and causation.

A.    <u>The Failure to Register Statements Are Not Well-Pleaded to Support any CEA Claim</u>

A review of the allegations in the Complaint and the additional submissions leads to the conclusion that any CEA claim based solely upon Sun's lack of registration with Federal and/or State regulatory authorities is not well pleaded in support of a claim of damages.

As recognized by several courts, a failure to register does not cause any pecuniary harm. <u>See, e.g.</u>, <u>Marshall v. Green Giant Co.</u>, 942 F.2d 539, 546 (8th Cir. 1991); <u>S&A Farms, Inc. v. Farms.com Inc.</u>, 862 F. Supp. 2d 898, 906 (S.D. Iowa 2011); <u>Hofmayer v. Dean Witter & Co., Inc.</u>, 459 F. Supp. 733, 739 & n. 4 (N.D. Cal. 1978); <u>Ping He</u>, 22 F. Supp. 2d at 108 ("A party does not suffer damage merely by dealing with an unregistered [trader]; failure to register, without more, does not cause pecuniary loss."). Thus, to the extent that the Complaint alleges a CEA violation for the bare lack of registration, that claim is not well pleaded.

Even if Plaintiffs' CEA lack of registration allegations are pleaded in support of a claim of commodities fraud, any such claim fails because Sun's failure to disclose his lack of registration cannot be deemed a proximate cause of Plaintiffs' injuries. While the lack of registration may be deemed material, <u>i.e.</u>, objectively important to a reasonable investor, this omission could not, in this case, possibly satisfy the proximate cause element required to sustain a claim for CEA damages.

The notion that any of the Plaintiffs here would have cared about Sun's registration status is belied completely by the allegations of the Complaint, and the WeChat conversations between and among Plaintiffs and Sun. Those conversations make clear that Sun's business was being run outside of the auspices of any governmental regulation. This conclusion is well-supported by the facts that Plaintiffs were told they could use only Chinese phones (and more than one) and that trades must be made under a foreign exchange (Okex) and not on an exchange under the

39

regulation of the United States government (Coinbase). That the lack of registration would have made no difference to Plaintiffs, and therefore could not have possibly been a proximate cause of their injuries, is further evidenced by Plaintiffs' willingness to refrain from even using the term "Bitcoin," but were instead comfortable referring to substantial monetary investments as the purchase of "big pancakes." Individuals like Plaintiffs who were willing to invest large sums of money and abide by rules which the Court generously refers to as "unconventional" makes clear that the niceties of registration would have made no difference. Indeed, if Sun had specifically told Plaintiffs not to refer to a lack of U.S. or New York State registration, it is more than likely that they would have gone along with that requirement just as easily as they went along with referring to money as breakfast food, and transacting business only via multiple foreign phones. It is beyond the pale to even consider that individuals drawn to such a scheme would care if the person who they instructed to purchase Bitcoin was registered with any Federal or State body. In sum, the well-pleaded allegations of the Complaint fail to show the proximate cause necessary to sustain any claim for damages based upon the failure to disclose that Sun was not registered to deal in commodities.

For the foregoing reasons, the Court recommends that Plaintiffs' motion for default judgment based upon the failure to register claims be denied.

B.    The Fraudulent Statement Allegations are Well-Pleaded to Support a CEA Claim

The Complaint and Plaintiffs' submissions, although difficult in many places to fully understand, satisfy all elements of a claim under Section 6(c) of the CEA and the regulation promulgated thereunder. Specifically, it is well pleaded that Sun deliberately and knowingly made misrepresentations, misleading statements, and omissions as part of a scheme to defraud, and that such statements were the proximate cause of damages as set forth below.

Sun made false statements to Plaintiffs with respect to his expertise and the nature of their investments. Thus, Sun falsely claimed that he was some sort of an expert in cryptocurrency. He also falsely claimed that Plaintiffs' investments were risk-free, in that they could request the return of principal at any time. While statements regarding dividends were vague, they were, in the end, false as well. Plaintiffs were never paid any dividends. Also false were Sun's statements as to the never-ending rise in the value of Bitcoin. Most notable among Sun's false statements were those stating that he was, in fact, going to purchase Bitcoin and somehow "manage" them for Plaintiffs. Not only was no management ever taking place, it is questionable whether Sun ever even purchased Bitcoin for Plaintiffs – there are simply no records of any such purchases or any evidence that Bitcoin ever made its way into any wallet on Plaintiffs' behalf. Also false were Sun's statements as to why Plaintiffs' money could not be returned. Among those statements were Sun's stalling tactics regarding his cooperation in some investigation regarding "dirty money," and that Plaintiffs' accounts were somehow frozen. These statements were nothing more than excuses concocted by Sun to cover up the only reasonable conclusion – that he had stolen Plaintiffs' money.

Sun's misstatements were clearly of the sort that would be important to investors and were therefore material. There is no doubt that statements as to risk are objectively important and therefore material to investors. See McDonnell, 332 F. Supp. 3d at 720 (stating that included among material statements are those regarding risk assessment). The subjective materiality to the Plaintiffs here is also clear. Thus, in nearly every communication with Sun each Plaintiff repeatedly sought assurances that they could withdraw principal at any time, and that they were participating in his dividend program.

Moreover, Sun acted with scienter. His statements regarding the guarantee of principal in the context of a fluctuating cryptocurrency, like Bitcoin, are manifestly false. Such statements, especially when coming from one who holds himself out as an expert, present a clear risk of misleading customers, and support a finding of intentional misconduct or, at the very least, the recklessness required to support a finding of scienter.

Finally, the "in connection with" requirement of Section 6(c) and Regulation 180.1 are met. Sun's statements were made to entice Plaintiffs to send money to Sun for the intended purchase of Bitcoin. As such, they were made in connection with the sale of a commodity.

Based on the foregoing, this Court respectfully recommends that Plaintiffs' motion for default judgment based upon the CEA fraudulent statements claim be granted.

VII.   Damages

As discussed above, a private plaintiff is entitled to an award of damages under the CEA for injuries proximately caused by the violation. Such causation is satisfied by a showing not only of "but for" causation, but also that the CEA violation was a substantial factor in causing a plaintiff's injury. S.A. Farms, 862 F. Supp. 2d at 908. Here, Sun violated the CEA by making false statements in connection with the purchase of Bitcoin. As a result of those statements, Plaintiffs transferred funds to Sun to purchase Bitcoin. In the proximate cause analysis, the subjective importance of the statements relied upon is clear. No Plaintiff would have trusted Sun with their money if they did not believe they were making a risk-free investment, i.e., an investment that guaranteed the return of their principal investment at any time. Thus, Plaintiffs properly show the element of proximate cause with respect to the guarantee that they would be able to get back the principal amounts transferred. The decision of each Plaintiff to transfer funds

to Sun was therefore causally related to Sun's false statements regarding the guarantee of principal.

The only question remaining is the proper measure of damages. "It is well settled that a money judgment by an American court must be in American currency." Shaw, Savill, Albion & Co. v. The Fredericksburg, 189 F.2d 952, 954 (2d Cir. 1951) (citing cases). Plaintiffs seek the judgment day U.S. dollar value of the promised Bitcoins that Sun was to have purchased. To be clear, they do not seek return of the amount they transferred to Sun risk-free. Thus, even if the value of Bitcoin on the day judgment is entered turns out to be less than their initial investment, they seek only that amount.

While New York courts typically apply the "judgment day rule" to "claims based upon an obligation denominated in a foreign currency," Hood v. Ascent Med. Corp., No. 13cv0628, 2016 WL 1366920, at *23 (S.D.N.Y. Mar. 3, 2016) (citing Weiss v. La Suisse, Societe D'Assurances Sur La Vie, 293 F. Supp. 2d 397, 408-09 (S.D.N.Y. 2003), such that the foreign-money judgment "shall be converted into currency of the United States at the rate of exchange prevailing on the date of entry of the judgment," Hood, 2016 WL 1366920, at *23 (citing N.Y. Judiciary Law § 27(b), doing so here would not make sense. Plaintiffs' request for the judgment day U.S. Dollar value of the promised Bitcoin is inconsistent with their claim that each was making a risk-free investment, in that each was guaranteed the return of principal invested with Sun. It makes more sense therefore to award each Plaintiff the amount that each transferred to Sun. This protects both Plaintiffs and the defaulting Defendant against the "highly volatile" fluctuating value of Bitcoin – an argument Plaintiffs made in support of their initial claim for expedited review. (DE [13] at 16.) Awarding each Plaintiff the amount transferred to Sun, in connection with a scheme that may or may not have ever resulted in the purchase of Bitcoin, is consistent with the CEA's

requirement that private plaintiffs be awarded damages proximately caused by defendant's violation of the Act.

Here, Sun's false statements were made in connection with a scheme to lure Plaintiffs into a risk-free purchase of cryptocurrency. Plaintiffs, who turned over funds to Sun based upon such statements, are entitled to return of their money. For those Plaintiffs who transferred funds to Sun in the form of RMB or Bitcoin, the dollar sums recommended to be awarded reflect the value of the funds transferred to Sun as of the day of each transfer. Such valuations are based upon Plaintiffs' affidavits of value. More specifically, as to RMB, the valuations below are based upon the precise value stated in the affidavit of the Plaintiff who made the transfer. As to the value of Bitcoin transferred (which applies to Plaintiffs Lan and Feng) the U.S. dollar damages recommended reflect either the cost quoted by Sun for one Bitcoin, or the cost quoted to the Plaintiff who made the transfer.

For the foregoing reasons, the Court recommends that each Plaintiff be awarded damages, in U.S. dollars, as follows:

Plaintiff Fei Jing:     $11,500.00

Plaintiff Luosu Li:     $23,600.00

Plaintiff Jinyu He:     $68,529.90 ($47,000.00 transferred in U.S. dollars and $21,529.90 in U.S. dollars – the value of 144,504 RMB sent to Sun as stated in He's affidavit).

Plaintiff Duanyang Wang:     $136,729.50 (two separate U.S. dollar transfers in the amounts of $22,600.00 and $35,300.00 and $78,829.50 – the total U.S. dollar value of separate RMB transfers as stated in Wang's affidavit).

44

Plaintiff Tian Lan:          $22,527.00 ($16,777.00 transferred in U.S. dollars and $5,750.00 - the value of .5 BTC as of August 2, 2020, which, based upon the affidavits of Lan's co-plaintiffs, the Court values as half of the $22,500.00 value of one Bitcoin).

Plaintiff Chuyao Feng:          $45,800.00 ($23,400.00 transferred in U.S. dollars and $22,400.00 – the value of 2 BTC based upon Feng's affidavit as to the $11,200.00 price per Bitcoin that Feng paid to Sun).

VIII.   Post-Judgment Interest

Plaintiffs also request an award of post-judgment interest, pursuant to 28 U.S.C. § 1961, which must be applied to "any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961; see also Khurana v. JMP USA, Inc., No. 14-CV-4448, 2017 WL 1251102, at *17 (E.D.N.Y. Apr. 5, 2017).  Accordingly, this Court recommends awarding post-judgment interest, to be calculated based on the weekly average one-year constant maturity Treasury yield for the week preceding the date on which judgment is entered.  See 28 U.S.C. § 1961(a) ("[I]nterest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding."); see also Schipani v. McLeod, 541 F.3d 158, 165 (2d Cir. 2008) (holding that post-judgment interest is mandatory and calculated pursuant to federal statute).

IX.   Costs

Reasonable and identifiable out-of-pocket disbursements ordinarily charged to clients are recoverable.  See LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 763 (2d Cir. 1998). The party seeking to recover costs "bears the burden of adequately documenting and itemizing the costs requested." Ganci v. U.S. Limousine Serv. Ltd., No. 10-cv-3027, 2015 WL 1529772, at *8

(E.D.N.Y. Apr. 2, 2015) (quoting Pennacchio v. Powers, No. 05-cv-985, 2011 WL 2945825, at *2 (E.D.N.Y. July 21, 2011)).  Here, Plaintiffs have submitted proper documentation showing they are entitled to recover costs in the amount of $857.00, which represents a filing fee of $402.00 and process server fees of $455.00.

RECOMMENDATION

For the reasons stated herein, it is respectfully recommended that Plaintiffs' motion for default judgment be granted in part and denied in part and that damages be awarded, in U.S. dollars, as follows: (1) Plaintiff Fe Jing - $11,500.00; (2) plaintiff Luosu Li - $23,600.00; (3) Plaintiff Jinyu He - $68,529.90; (4) Plaintif Duanyang Wang - $136,729.50; (5) Plaintiff Tian Lan - $22,527.00; and, (6) Plaintiff Chuyao Feng - $45,800.00. It is further recommended that Plaintiffs be awarded post-judgment interest, to be calculated by the Clerk of the Court, pursuant to 28 U.S.C. § 1961. Finally, the Court recommends that Plaintiffs be awarded costs in the amount of $ 857.00, for a total monetary award of $309,543.40.

OBJECTIONS

A copy of this Report and Recommendation is being electronically served on counsel. Further, the Court is directing Plaintiffs 'counsel to serve a copy of this Report and Recommendation by overnight mail and first-class mail to Defendant at his last known address(es), and to file proof of service on ECF, by January 7, 2022.  Any written objections to the Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this report.  28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b).  Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections within fourteen (14) days will preclude further review

of this report and recommendation either by the District Court or Court of Appeals.  Thomas v. Arn, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.").

**SO ORDERED.**

Dated: Central Islip, New York
      January 4, 2022

                              /s/ Anne Y. Shields
                              ANNE Y. SHIELDS
                              United States Magistrate Judge